**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| SONYA LEE SHAW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09-CV-735-CVE-TLW |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Sonya Lee Shaw seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance and supplemental security income ("SSI") benefits under Title II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A).[1] As set forth below, the undersigned recommends that the case be remanded for further proceedings.

**Background**

Plaintiff was born on February 12, 1982 and was 26 years old on the date of the hearing before the Administrative Law Judge ("ALJ"). [R. 53]. She has a high school education and vocational training in cosmetology. [R. 626-623]. From July 24, 1999 to August 1, 2006, plaintiff was married to Nicholas Shaw. [R. 54]. Two children were born of the marriage, Isaac and Jesse

---

[1] Plaintiff's applications for disability insurance benefits and SSI were denied initially and on reconsideration. A hearing before Administrative Law Judge Charles Headrick was held on December 9, 2008. [R.621]. By decision dated March 24, 2009, the ALJ entered the findings that are the subject of this appeal. The Appeals Council denied plaintiff's request for review. The decision of the Appeals Council represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

Shaw, ages five and six years old. [R. 54, 626]. Plaintiff filed her application for disability on December 18, 2006, alleging an onset date of July 1, 2006. [R. 53]. Plaintiff's alleged onset date is a month prior to her divorce. Medical records dated April 6, 2007, indicate plaintiff was sexually active having recently ended a fourteen month relationship with her boyfriend. [R. 473]. At the time of the hearing in 2008, witness Michael McKenzie testified that he had known plaintiff for four years and that he and his daughter were living with plaintiff and her kids in a house owned by plaintiff's grandmother and that before that, plaintiff had lived with him. [R. 650, 626]. Plaintiff is 5' 1" tall and weighs 140 pounds. [R.625]. The relevant adjudicated period is July 1, 2006 through March 24, 2009. [R. 14-20, 53-55].

At age seven, plaintiff was diagnosed with insulin-dependent diabetes mellitus, which was treated with an insulin pump.[2] In 2005, at age 23, plaintiff developed diabetic ketoacidosis as a result of her "questionable medical compliance."[3] [R. 184]. Plaintiff stopped using an insulin pump and began using Lantus.[4] [R. 184]. From January 19, 1999, through August 6, 2008, plaintiff's medical history is replete with statements regarding her noncompliance with her prescribed treatment

---

[2] Diabetes mellitus is type 1 diabetes in which the body cannot regulate the amount of glucose in the blood. Type 1 diabetics do not produce enough insulin or produce too little to regulate the blood glucose level. Onset typically occurs in childhood and requires daily insulin treatment to sustain life. See emedicinehealth.com/diabetes.

[3] Diabetic ketoacidosis results from dehydration during a state of relative insulin deficiency, associated with high blood levels of sugar and organic acids called ketones. Diabetic ketoacidosis is associated with significant disturbances of the body's chemistry. See emedicinehealth.com/diabetic_ketoacidosis.

[4] Lantus is a prefilled insulin pen. See lantus.com

plan for controlling her diabetes.[5]

As to employment, in 1999 and 2000, plaintiff was a sacker and deli helper at Albertsons and

---

[5] These statements, by various medical providers, include the following:

| | |
|---|---|
| 01/19/99 | poorly controlled [R. 133]; |
| 05/04/99 | historic noncompliance [R. 140]; |
| 05/11/99 | mother's statement, daughter does not take care of her diabetes. [R.338]; |
| 01/19/00 | extremely poor control [R. 388]; |
| 11/28/01 | treating physician's notation, indicating plaintiff was capable of controlling her diabetes. [R. 377]; |
| 05/07/02 | type 1 diabetes poorly controlled, reinstate carbohydrate counting and correction factor adjustment of insulin [R. 305]; |
| 09/26/02 | type 1 diabetes poorly controlled, re-referred to diabetes education [R. 303]; |
| 10/02/02 | fair to poor control [R. 373]; |
| 10/30/02 | glucose poorly controlled [R. 302]; |
| 11/06/02 | insulin pump instructions [R.394]; |
| 10/24/03 | treating physician, indicating she may be able to return to work if her neuropathy is controlled. [R. 282]; |
| 06/08/04 | poor control, a smoker, counseled to discontinue use of cigarettes [R. 277]; |
| 06/24/04 | admitted to emergency room, uncontrolled type 1 diabetes [R. 419]; |
| 02/17/06 | questionable medical compliance [R. 184]; |
| 07/05/06 | admitted to emergency room, instructed on diabetes education by a certified diabetic counselor [R.219]; |
| 11/05/06 | emergency room, diabetic ketoacidosis secondary to medical noncompliance, third admission to the emergency room in the past 30 days [R. 260]; |
| 11/30/06 | type 1 diabetes with poor control [R. 269]; |
| 02/23/07 | admonished by her optometrist for contract abuse causing damage to her eyes. [R. 434]; |
| 04/08/07 | emergency room, overdose of xanax, tested positive for methamphetamine. [R. 445]; |
| 04/10/07 | mental health practitioner's comment plaintiff appears content with her dependent status. [R. 470-471]; |
| 04/11/07 | uncontrolled type 1 diabetes, smoking cigarettes [R. 401-402]; |
| 10/14/07 | admitted to emergency room, failed to take insulin for a week [R.589]; |
| 12/13/07 | admitted to emergency room, uncontrolled diabetes, failed to take insulin for one week, not checking blood sugar, poorly controlled diabetes and medication noncompliance, smokes [R. 585-587]; |
| 08/06/08 | emergency room, advised to quit smoking [R. 565]; |
| 06/05/09 | emergency room, minor car accident, very intoxicated and belligerent. [R. 573]. |

Reasors. [R. 49]. During 2000, plaintiff was employed as a waitress for Silver Dollar Café and Sexton Bar-B-Q in Collinsville, Oklahoma. [R. 50]. From 2000 to 2003, she worked for her grandmother as a cashier at a convenience store, Dona Enterprises. [R. 50, 73-74, 649]. In 2004, 2005 and 2006, she was employed by Hillcrest Medical Center, as a housekeeper and a gift shop cashier. [R. 50-51]. In 2005, she worked on an assembly line for American Transportation Corp, taping and masking bus parts. [R. 50]. Plaintiff's last employment was in 2006, at Hillcrest Medical Center as a cashier in the gift shop, where she earned $1,612.84. [R. 71-77, 49-52, 627]. In her application, plaintiff lists her impairments as diabetes, neuropathy, kidney problems and headaches. [R. 59].

## Decision of the Administrative Law Judge

In assessing plaintiff's qualification for benefits, the ALJ found plaintiff had not engaged in substantial gainful activity since her alleged onset date of July 1, 2006; he found her severe impairments to be diabetes, neuropathy, diabetic macular edema, and depression; and he found these impairments, singly and in combination, to be severe, but that they did not meet or medically equal any of the listed impairments in 20 CFR Part 404, subpart P, Appendix 1. [R. 16-18]. The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform the exertional demands of medium work, except for work that required understanding, remembering, and carrying out detailed job instructions or more than minimal interaction with the public. [R.18 ]. The ALJ consulted and relied on a vocational expert who testified that plaintiff's past work was unskilled and semi-skilled, and classified as light in exertion. In comparing plaintiff's RFC with the physical and mental demands of this work, the ALJ found that plaintiff was able to perform her past work as she actually performed it and as it is generally performed. [R. 20]. The ALJ therefore determined, at

step four of the five-step sequential analysis, that plaintiff could return to her past relevant work as a cashier, taper/masker, and waitress. [R. 20]. See Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing the five steps in detail).[6]  In assessing her credibility, the ALJ found that the "evidence clearly shows that the claimant is noncompliant with treatment." [R. 19]. He then summarized plaintiff's long standing failure to follow her physician's prescribed treatment plan to control her blood sugar level, her frequent trips to the emergency room for treatment, her symptoms from noncompliance, her refusal to participate in diabetic education, and her decision to leave the hospital against medical advice. [R. 19].  He concluded that plaintiff's explanation for noncompliance was not justifiable. [R. 19-20].

## Burden of Proof and Standard of Review

In social security cases, plaintiff bears the burden of establishing a prima facie case of disability at steps one through four of the five step evaluation. Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir. 1993). Once plaintiff has established a disability, the burden shifts at step 5 to the Commissioner to show that the plaintiff retains the ability to do other work activity and that jobs the plaintiff could perform exist in the national economy. Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989). To prove a disability, the plaintiff must establish a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

---

[6] The five-step sequence provides that the claimant (1) is not gainfully employed, (2) has a severe impairment, (3) has an impairment which meets or equals an impairment presumed by the Secretary to preclude substantial gainful activity, listed in Appendix 1 to the Social Security Regulations, (4) has an impairment which prevents her from engaging in her past employment, and (5) has an impairment which prevents her from engaging in any other work, considering her age, education, and work experience. Ringer v. Sullivan, 962 F.2d 17 (10th Cir. 1992) (unpublished) citing Williams v. Bowen, 844 F.2d at 750-52.

The role of the Court in reviewing the decision of the Commissioner under the provisions of 42 U.S.C. § 405(g) is limited to evaluating whether the record contains substantial evidence to support the Commissioner's findings, and to determine whether the correct legal standards were applied. See Briggs ex. rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001); Winfrey v. Chater, 92 F.3d 1017 (10th Cir. 1996); Castellano v. Secretary of Health & Human Serv., 26 F.3d 1027, 1028 (10th Cir. 1994). Substantial evidence to support the Commissioner's decision that plaintiff is not disabled is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Broadbent v. Harris, 698 F.2d 407, 414 (10th Cir. 1983) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner, but the Court has a duty to carefully consider the entire record and make a decision based on the record as a whole. Dollar v. Bowen, 821 F.2d 530, 532 (10th Cir. 1987). Even if the Court would have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. Hamilton v. Secretary of Health & Human Services, 961 F.2d 1495 (10th Cir. 1992).

**Review of the ALJ's Decision as it Relates to Noncompliance and Credibility**

The ALJ thoroughly reviewed the issue of plaintiff's noncompliance with her diabetes treatment plan. Plaintiff does not challenge the ALJ's detailed findings that she was noncompliant with her physicians' prescribed treatment plan. In addition, the ALJ's findings support his conclusion that plaintiff's testimony was not entirely credible regarding her inability to work.[7]

---

[7] Social Security regulations provide that claimants who fail, without good reason, to follow a prescribed treatment will be denied benefits if it appears the treatment can restore the claimant's ability to work. 20 C.F.R. §§ 404.1530, 416.930; see also Teter v. Heckler, 775 F.2d 1104, 1107 (10th Cir. 1985). The Tenth Circuit requires four elements to be met before an ALJ can deny benefits for failure to follow prescribed treatment: "(1) the treatment at issue should be expected to

As evidentiary support for his determination, the ALJ found that plaintiff's "daily activities appear restricted, but these restrictions are self imposed." [R. 20]. He also found that plaintiff's treating physicians had not placed any functional restrictions on her activities that would preclude light work activity with the specified limitations. [R. 20]. The record also supports the ALJ's findings as to credibility. For example, on February 23, 2007, plaintiff's optometrist, Dr. Len Hart admonished plaintiff for her failure to monitor her sugar levels, failure to take her diabetic medication and failure to regularly see her diabetic doctor. He also diagnosed her with contact lens abuse for failure to follow his instructions. Dr. Hart opined that plaintiff was not disabled and that "[p]erhaps a steady job would motivate her to take better care of herself." [R. 434]. On November 28, 2001, plaintiff's endocrinologist Dr. Christian Hanson, reviewed a blood report showing a normal blood sugar level and commented, "Very good glucose control; see it can be done." [R. 377]. On October 24, 2003, Dr. Hanson wrote in his examination notes that plaintiff believes she should go on disability and SSI, but he advised if her neuropathy was under control that "she may be able to return to work." [R. 281-282]. The ALJ found as follows:

> Based on the evidence, the claimant did not see Dr. Hanson from December 27, 2004, until November 30, 2006. On February 23, 2007, the claimant stated she had not seen her diabetic doctor "in some time." She returned to see Dr. Hanson on April 11, 2007. On April 17, 2007, the claimant presented to the emergency room stating she had been out of diabetic medication for a week. The claimant testified that she had not seen Dr. Hanson since April 2007. On October 14, 2007, the claimant was seen in the emergency room with a blood sugar of greater than 600. On December 13, 2007, the claimant's blood sugar was greater than 500 and she stated she had not been checking her blood sugars.

---

restore the claimant's ability to work; (2) the treatment must have been prescribed; (3) the treatment must have been refused; and (4) the refusal must have been without justifiable excuse." Id. In the instant case, the ALJ did not make a determination that the prescribed treatment would restore plaintiff's capacity to work.

[R. 19-20].[8]

As to her depression, on April 8, 2007, a mental health practitioner commented that plaintiff appeared content with her dependent status and upon pursuing disability considering herself as incapable of working or benefitting from vocational rehabilitation. [R. 470]. The ALJ found that plaintiff was noncompliant with her physician's recommended mental health care:

> When the claimant was discharged on April 12, 2007, she was to follow up with outpatient mental health treatment. There is no further mention of depression until June 8, 2007, when the claimant was noted to have situational anxiety. The claimant did not follow up with outpatient treatment and there is no mention of depression until the claimant was seen on February 10, 2008, with acute alcohol intoxication. The claimant takes no medication for depression.

[R. 19]. The ALJ set forth the dates of each of plaintiff's trips to the emergency room to stabilize her blood sugar and her physicians' notations of her history of noncompliance:

> The claimant was seen in the emergency room on February 25, 2004, with a blood sugar of 200. The claimant was hospitalized on June 24, 2004, for nausea and vomiting and found to have a blood sugar of 500. On November 2, 2004, the claimant was seen in the emergency room with a blood sugar of 23 and was unresponsive. There are no further emergency room reports until February 17, 2006, when the claimant was seen with a blood sugar greater than 500. The claimant was noted to have a history of "questionable medical compliance." She was also noted to no longer be using an insulin pump. The claimant was hospitalized on July 4, 2006, for intractable nausea and vomiting. Her blood sugar on admission was 304 and she was determined to be in diabetic ketoacidosis. The claimant was also noted to be noncompliant. The claimant was hospitalized on November 5, 2006, for a blood sugar of 379. The claimant was again noted to be noncompliant and it was also noted that she refused diabetic education and medication titration, and left the hospital against medical advice. On February 23, 2007, the claimant stated that she did not check her blood sugar, occasionally missed her medication, and had not seen her diabetic doctor in some time. When told that her contact lens abuse could lead to severe vision loss or blindness, Dr. Hart stated the claimant 'didn't seem to care.'

[R. 19].

---

[8] Hearing exhibit numbers are omitted in all of the ALJ's quoted text from his decision.

At the hearing, the ALJ asked plaintiff whether she was currently using an insulin pump and the reason for her history of noncompliance:

> Q. Are you able to use the pump right now?
>
> A. No.
>
> Q. Why not?
>
> A. I don't have any supplies for it.
>
> Q. Okay. And why is that?
>
> A. Well, they're very expensive, and I don't have any health insurance.
>
> Q. Okay. So you've been trying to do the best you can to manage, how?
>
> A. Well, my grandmother buys my insulin. And I take Mylanta once in the evening, and then I take a —my fast acting every time I eat. I'm suppose to check my blood and base what I take off of that, but I don't have the money for strips either.
>
> . . . .
>
> Q. Okay. Is there anything the doctors have told you can or can't do that would help, or what the next step is?
>
> A. Well, take all my proper medications.
>
> Q. But, again, you don't because --
>
> A. Of my health insurance. I don't have any.
>
> Q. Okay. And its too expense otherwise.
>
> A. Yes.
>
> Q. Okay. Anyone helping you monetarily? Who's paying your bills?
>
> A. Oh, my grandmother. I'm sorry.

[R. 628-629, 647-648]. The ALJ rejected plaintiff's explanation for noncompliance with her

prescribed plan. In finding her excuse unreliable he found that she did not regularly take her medication when she could afford medication; he referred to her mother's statement, that plaintiff "did not take care of her diabetes and overate and skipped meals." [R. 19]. He cited her physician's notes dated November 30, 1999, June 1, 2000, September 26, 2002, and June 11, 2003, showing her noncompliance. He also noted that plaintiff's medical records were void of any records in 2005. [R.20]. He rejected plaintiff's purported financial inability to pay for treatment, finding she had resources to purchase alcohol and methamphetamine and that her grandmother supplied her with insulin. [R. 19].[9] Thus, the undersigned finds that the ALJ entered sufficient factual findings regarding plaintiff's noncompliance to impeach plaintiff's credibility as to the limiting effects of her impairments.

However, the ALJ did not determine the merits of this case based on plaintiff's noncompliance.[10]

---

[9] The regulations provide the following "acceptable reasons" for failure to follow a prescribed treatment: (1) The specific medical treatment is contrary to the established religious teachings and tenets, (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment; (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment; (4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g. organ transplant), or other reason is very risky; and (5) The treatment involves amputation of an extremity, or major part of an extremity. 20 C.F.R. § 404.1530.

[10] The ALJ did not enter the requisite finding as to whether plaintiff's compliance with her prescribed treatment plan would restore her ability to work. SSR 82-59, provides in relevant part: "While it is a treating source who must prescribe treatment in order for the issue of 'failure' to arise, the judgment as to whether prescribed treatment can be expected to restore ability to work will be made by the SSA." SSR 82-59, 1982 WL 31384, at 794.

### Issues Raised

Plaintiff raises three issues on appeal:

First: Whether the ALJ findings that plaintiff's work as a taper/masker and waitress qualifies as past relevant work rather than unsuccessful work attempts. [Dkt. # 17 at 7].

Second: Whether the ALJ's hypothetical question to the vocational expert included all of plaintiff's impairments. [Dkt. # 17 at 9].

Third: Whether the ALJ performed a proper step four analysis in determinating that plaintiff was capable of performing her past work as a cashier and waitress. [Dkt. # 17 at 11].

### Discussion

As her first issue on appeal, plaintiff claims the ALJ erred in classifying her employment as a taper/masker on an assembly line, and as a waitress for two cafes, as past relevant work rather than as unsuccessful work attempts. The undersigned disagrees. At step four of the sequential evaluation process, the burden is on the plaintiff to show that her impairment renders her unable to perform her past relevant work. Henrie v. U.S. Dept. of Health & Human Services, 13 F.3d 359 (10th Cir. 1993). Based on the record, the ALJ determined that, although plaintiff suffered from a combination of severe impairments, her impairments did not prevent her from performing her past work as a waitress in a café, cashier for her grandmother or in a hospital gift shop, or on an assembly line taping and masking, as she actually performed the work or as those jobs are generally performed in the national economy. A claimant's past work experience qualifies as past relevant work if it was done within the last fifteen years, lasted long enough for her to learn the technique, and earned sufficient money to be considered substantial gainful activity. See 20 C.F.R. §§ 404.1565(a), 416.965(a).

Plaintiff does not dispute that she worked as a waitress and a taper/masker in the past 15 years, or that her work in these jobs was substantial gainful employment. Rather plaintiff contends she was

a waitress and taper/masker for only a few months, and she quit or was fired from these positions because of her poor health. Under the regulations, the Commissioner will consider past work as an unsuccessful work attempt if, <u>inter alia</u>, it lasts for less than six months and plaintiff establishes that she was frequently absent from work or her work was unsatisfactory because of her impairments. <u>See</u> 20 C.F.R. 404.1574(c)(4), 416.974(c)(4).  Plaintiff relies on her own testimony to support her claim.  The undersigned disagrees.

The ALJ determined that plaintiff's testimony was not credible because she failed to comply with her prescribed treatment plan. Moreover, plaintiff worked as a cashier for her grandmother for three years, and for Hillcrest Hospital for two years. Her work as a cashier clearly establishes that plaintiff has the capacity to perform work for longer than six months. In making the determination that plaintiff could perform her past relevant work, the ALJ relied on the vocational expert's testimony that plaintiff's past work as a cashier, waitress and masker/taper were classified as unskilled and semi-skilled, had an SVP of 3 when performed at light exertion.[11] [R. 654-655]. The ALJ found that plaintiff's treating physician did not place any functional restrictions on her activities that would preclude light work activities, and that although her daily activities appear restricted, these restrictions were self imposed. The undersigned finds that substantial evidence supports the ALJ's findings that plaintiff's work as a waitress and masker/taper qualify as past relevant work.

As her second issue of error, plaintiff contends the ALJ's hypothetical question to the vocational expert failed to match the restrictions that the ALJ included in plaintiff's RFC, therefore

---

[11] Specific Vocational Preparation (SVP) is defined as the amount of time required by a typical worker to learn the technique, acquire the information and develop the facility needed for average performance in a specific job-worker situation. An SVP of 3 indicates a time period of 1 month up to and including 3 months. See www.occupationalinfo.org/appendixc_1.html

his reliance on the vocational expert's opinion was not supported by substantial evidence. Specifically, she contends his hypothetical inquiry did not include a restriction for work requiring "understanding, remembering, and carrying out detailed job descriptions." [Dkt. # 17 at 10]. In formulating his RFC, the ALJ determined that plaintiff could perform up to medium level exertional work, except for work that required "understanding, remembering, and carrying out detailed job instructions or more than minimal interaction with the public." [R. 18]. At the hearing, the ALJ verified that the vocational expert had studied the record and plaintiff's testimony regarding her work history and that he did not need additional testimony for clarification or elaboration. [R. 654]. The ALJ then propounded the following hypothetical question to the vocational expert.

> Q: Assume the Claimant to be a 26-year-old female with a high school education and the ability to read, write, and use numbers. Assume further this individual has the physical capacity to perform work consistent with the limitations of Exhibit 20F, that she has the functional or mental limitations based upon diagnosis of Exhibit 19F, and the limitations of Exhibit 18F.
>
> A: All right, Your Honor.
>
> Q: Assume the foregoing, could this individual return to her past work?
>
> A: Yes, Your Honor. She could return to all of her past work.

[R. 654-655]. As shown, the ALJ asked the vocational expert to include limitations based upon the diagnosis of Dr. Tabor as shown in Exhibit 18F. [R. 655]. In Exhibit 18F, Dr. Taber opined that plaintiff was moderately limited in her "ability to understand and remember detailed instructions and in her ability to carry out detailed instructions." [R. 489]. The ALJ's hypothetical clearly covered the specific limitation that plaintiff contends was omitted. Thus, the undersigned finds plaintiff's contention has no merit.

As her third issue of error, plaintiff contends the ALJ failed to perform a proper step four

analysis in determining that plaintiff could perform her past relevant work as a cashier and waitress. Specifically, she contends: (1) the ALJ failed to inquire into the specific mental functioning requirements of her past work in light of the mental restrictions he included in plaintiff's RFC, (2) he failed to determine whether plaintiff could meet the demands of her past work, considering her RFC limitations, and (3) he restricted plaintiff's work to minimal contact with the general public which is inconsistent with the job description for cashier and waitress. [Dkt. # 17 at 11-14]. The undersigned finds merit to this contention.

At step four, the ALJ is to apply a three phase analysis in determining whether the plaintiff has the ability to return to her past relevant work. See Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996).

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

Id. On appeal, plaintiff argues that the ALJ failed to consider the mental demands of her past work as cashier and waitress and compare those mental demands to the no "more than minimal interaction with the public" restriction that he imposed in his RFC assessment. Plaintiff relies on a recent case, Krueger v. Astrue, 337 Fed.Appx. 758 (10th Cir. 2009) (unpublished).[12] The undersigned agrees. The ALJ's conclusion that plaintiff is capable of returning to her past work as cashier and waitress conflicts with the restriction in his RFC assessment that she have no "more than minimal contact with the public," because the Dictionary of Occupational Titles (4th ed. 1991) (DOT) indicates that jobs

---

[12] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

as a cashier and waitress require significant contact with people. See DIOT 211.462-014, WL 671841 (Cashier-Checker); DIOT 311.477-030, 1991 WL 672688 (waitress). The undersigned concludes that a conflict does exist between the VE's testimony and the job description in the DOT. The ALJ failed to ask the vocational expert to reconcile this conflict, thus resulting in error under Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999) (holding that the ALJ must investigate and elicit a reasonable explanation for any conflict between the DOT and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability). See Krueger v. Astrue, 337 Fed.Appx. at 761-762.

## RECOMMENDATION

The undersigned finds that the ALJ's decision at step four of the sequential analysis is not supported by substantial evidence because a conflict exists between the vocational expert's testimony and the DOT, which is at odds with the law announced in Hackett. Accordingly, the undersigned RECOMMENDS that this case be remanded to the Commissioner of Social Security for a second hearing to illicit additional step-four testimony from the vocational expert and, if appropriate, step five consideration. In addition, the Commissioner should consider whether this case is appropriate for determination on the merits under the provisions of 20 C.F.R. §§ 404.1530, 416.930 and SSR 82-59, Titles II and XVI: Failure to Follow Prescribed Treatment.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by November 26, 2010.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge

to:

> determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

See also 28 U.S.C. § 636(b)(1).

The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 12th day of November, 2010.

_____
T. Lane Wilson
United States Magistrate Judge